# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| ORVILLE CARTER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:09-CV-393-TS |
| | ) | |
| SUPERINTENDENT, | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

Orville Carter, a prisoner proceeding pro se, is serving a 60-year sentence for child molestation and habitual offender adjudication in Marion County. *State v. Carter*, 49G03-9907-CF-099435. He has filed this Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254. [ECF No. 1.] The Respondent argues that the Petition should be denied because Carter's claims are not cognizable, are procedurally defaulted, or fail on the merits. [ECF No. 26.]

## FACTS

In deciding the Petition, the Court must presume the facts set forth by the state courts are correct. 28 U.S.C. § 2254(e)(1). It is Carter's burden to rebut this presumption with clear and convincing evidence. *Id*. In 1999, Carter was convicted of molesting his nine-year old daughter, M.C., who is autistic. *Carter v. State*, 754 N.E.2d 877, 878 (Ind. 2001). The Indiana Supreme Court summarized the facts underlying the conviction as follows:

> M.C. is a highly intelligent child who sometimes makes inappropriate comments because she is autistic. On May 25, 1999, M.C.'s mother Jessica Carter talked with her about subjects that are "personal" and not for public discussion. M.C. asked if weather was personal, and Jessica said no. M.C. then asked "if someone showing you their w[ie]nie was a personal thing." (R. at 140.)

M.C. went on to tell Jessica that Carter, M.C.'s father, came into her room one night and had M.C. touch his penis, then put it in her mouth. Jessica asked M.C. what that felt like, and M.C. replied that it felt like rubber.

Jessica told M.C. that other people would want to talk to her, and that M.C. should tell them the same story. She immediately sought advice at M.C.'s school, where she happened to encounter Dr. Robin Murphy, a psychologist specializing in autism who had worked with M.C. on three or four previous occasions. At the urging of school authorities, Jessica then took M.C. to the Family Advocacy Center for a videotaped interview with police officer Kathy Graban, where M.C. related the same story.

Officer Graban found it curious that M.C. "blurted out" her story unprompted. (R. at 183.) On Dr. Murphy's advice, she visited M.C. unannounced on June 4th to make sure that this spontaneity was the result of autism rather than coaching. M.C.'s story remained consistent.

The State charged Carter with child molesting, a class A felony, and with being an habitual offender.

M.C. was the first witness at trial. The prosecutor encountered difficulty immediately, when M.C. was unable to identify Carter in the courtroom. She did elicit a disjointed version of M.C.'s story. M.C.'s responses then became so rambling and incoherent that the prosecutor concluded her direct examination. On cross-examination, M.C. admitted that she did not remember Carter's attorney, whom she had met previously, and said, "I do get confused. I mostly forgot about you. . . ." (R. at 133.) When asked "Do you get confused a lot with things that have happened?", M.C. acknowledged, "Yes." ( Id.) She did reassert, however, that her father "went to jail because he—because he done something—touched my w[ie]nie . . . He made me touch his w[ie]nie, I should say." (R. at 134.)

Jessica Carter testified next. On direct examination, she described what M.C. said about the molestation. On cross, defense counsel elicited the fact that three weeks after this disclosure, Jessica overheard M.C. talking to herself about a schoolmate who said that "if you put a w[ie]nie in your mouth it grows." (R. at 147.) Jessica questioned M.C. further, and asked her again about the incident involving Carter. According to Jessica, M.C. said that "daddy woke her up and then daddy pulled his big-boy shorts down . . . ." (R. at 148.) Jessica pointed out to M.C. that "big-boy shorts" was their household term for briefs, which M.C.'s younger brother wore but her father did not. M.C. "looked a little confused and [ ] said, well, maybe it wasn't daddy." (R. at 149.)

Jessica also testified on cross-examination that M.C. is "[v]ery imaginative." (R. at 150.) She said that M.C. sometimes imagines things such as earthquakes and tornadoes that become very real in her mind.

The State next called Dr. Murphy as an expert witness. Officer Graban took the stand last and the State introduced M.C.'s videotaped May 25th interview. Officer Graban testified that M.C.'s story remained consistent on her June 4th unannounced visit.

Carter did not call any witnesses.

*Carter*, 754 N.E.2d at 878–79 (internal footnotes omitted).

The jury found Carter guilty of child molestation, and he pled guilty to the habitual offender charge based on prior convictions for child molestation and theft. *Id.* at 879. The trial court sentenced him to an aggregate term of 60 years. *Id.* Carter appealed, challenging the sufficiency of the evidence and raising a number of alleged trial errors. *Id.* The Indiana Supreme Court affirmed. *Id.* Carter filed a petition for certiorari with the United States Supreme Court, which was denied. [ECF No. 11-3.]

In June 2003, Carter filed a petition for post-conviction relief with the state trial court claiming ineffective assistance of trial counsel and various trial errors. [ECF No. 11-7.] Following an evidentiary hearing at which trial counsel and other witnesses testified, the court denied the petition. [*Id.*] The Indiana Court of Appeals affirmed. *Carter v. State*, No. 49A02-0803-PC-253 (Ind. Ct. App. order dated Apr. 8, 2009). The Indiana Supreme Court denied Carter's petition to transfer. *Id.* (Ind. order dated July 23, 2009).

Thereafter, Carter filed this federal petition raising the following claims: (1) insufficiency of the evidence; (2) denial of due process in connection with the admission of certain expert testimony; (3) ineffective assistance of trial counsel on various grounds; (4) denial of due process in connection with the admission of hearsay testimony; (5) denial of due process in

connection with the use of an alias on the charging document; (6) denial of due process in connection with the admission of M.C.'s testimony; (7) denial of due process in connection with the admission of M.C.'s videotaped statement to police; (8) denial of due process in connection with limitations imposed on Carter's cross-examination of Jessica Carter; (9) prosecutorial misconduct; and (10) denial of due process in the post-conviction proceedings. [ECF No. 1.] In a prior opinion, this Court determined that the petition was timely filed and ordered briefing on the merits. [ECF No. 22.]

**ANALYSIS**

Carter's petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA allows a district court to issue a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Court can grant an application for habeas relief if it meets the requirements of 28 U.S.C. § 2254(d), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under this deferential standard, a federal habeas court must "attend closely" to the decisions of state courts and "give them full effect when their findings and judgments are consistent with federal law." *Williams v. Taylor*, 529 U.S. 362, 383 (2000). A state court decision is "contrary to" federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court or reaches an opposite result in a case involving facts materially indistinguishable from relevant Supreme Court precedent. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal court may grant habeas relief under the "unreasonable application" clause if the state court identifies the correct legal principle from Supreme Court precedent but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith,* 539 U.S. 510, 520 (2003). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be "objectively" unreasonable. *Id.* "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, — S.Ct.—, 2011 WL 148587, at *11 (U.S. Jan. 19, 2011).

Before considering the merits of a habeas petition, the Court must ensure that the petitioner has exhausted all available remedies in the state courts. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). The exhaustion requirement is premised on concerns of comity, and the state courts must be given the first opportunity to address and correct violations of their prisoner's federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). For that opportunity to be meaningful, the petitioner must fairly present his constitutional claims in one complete round of state review. *Baldwin v. Reese*, 541 U.S. 27, 30–31 (2004); *Boerckel*, 526 U.S. at 845. The

petitioner must present the substance of his claim to the state court by "articulating both the operative facts and applicable law" that entitles him to relief. *Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009).

The companion procedural default doctrine, also rooted in comity concerns, precludes the Court from reaching the merits of a claim when either: (1) the claim was presented to the state courts and was denied on the basis of an adequate and independent state procedural ground; or (2) the claim was not presented to the state courts and it is clear those courts would now find the claim procedurally barred under state law. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991); *Perruquet*, 390 F.3d at 514. When a habeas petitioner fails to fairly present his claim to the state courts and the opportunity to raise that claim has now passed, the claim is procedurally defaulted. *Boerckel*, 526 U.S. at 853–54.

A habeas petitioner can overcome a procedural default by showing both cause for failing to properly exhaust a claim in state court and a resulting prejudice. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense" which prevented a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 492 (1986). A habeas petitioner may also overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006); *Coleman*, 501 U.S. at 750. Under this narrow exception, the petitioner must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). With these principles in mind, the Court turns to Carter's claims.

**A.      Sufficiency of the Evidence**

In his first claim, Carter asserts that there was insufficient evidence to support his conviction because M.C. was not a credible witness. [ECF No. 1 at 20.] Under the Due Process Clause, a defendant cannot be convicted unless the state proves all the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *In re Winship*, 397 U.S. 358, 364 (1970). When considering a sufficiency of the evidence claim in a federal habeas petition, the Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). The Court's role is limited on habeas review, and the Court is not permitted to reweigh the evidence or substitute its judgment for that of the finder of fact. *Id.*; *Ford v. Ahitow*, 104 F.3d 926, 939 (7th Cir. 1997). A sufficiency of the evidence claim premised on witness credibility is particularly difficult to prove. *McFowler v. Jaimet*, 349 F.3d 436, 456 (7th Cir. 2003). To find in favor of the petitioner on such a claim, the court must conclude not only that the witness was unreliable as a matter of law, "but that no court could reasonably think otherwise." *Id.*

Carter challenged the sufficiency of the evidence on direct appeal, arguing that M.C. was not credible and that her testimony, the core of the state's case, was insufficient to convict him. *Carter*, 754 N.E.2d at 879–80. In rejecting this claim, the Indiana Supreme Court applied a standard that was consistent with *Jackson,* which the court encapsulated as follows: "We look to the evidence and to the reasonable inferences from that evidence that support the verdict. We affirm if we find evidence of probative value from which a reasonable trier of fact could infer

guilt beyond a reasonable doubt."[1] *Id.* at 880 (citations omitted). Applying that standard, the court determined that M.C.'s testimony was not inherently improbable, and that the evidence was sufficient for the jury to have found Carter guilty beyond a reasonable doubt. *Id.* at 880–81. Based on the record, this was not an unreasonable application of *Jackson*.

The record shows that Carter is M.C.'s father, and she consistently identified her father as the man who molested her. She identified him as the perpetrator when she first confided in her mother about what had happened, and she continued to identify him as the perpetrator when speaking to police. At trial, despite some confusing points in her testimony, she clearly stated that it was her father who had "controlled" her and "forced" her to "touch his w[ie]nie." [Trial Tr. at 134.] Furthermore, M.C.'s testimony about what occurred was not inherently improbable. There was evidence that Carter worked the night shift and regularly came home in the early morning hours when everyone else in the household was asleep. He could have gone into M.C.'s room one night as she described without anyone else knowing. [*Id.* at 150.] M.C. also remembered specific details about what occurred, including what her father said to her during the incident, and she was consistent about where and what time of day the incident occurred. [*Id.* at 131–32.] She was also able to describe what it felt like when she touched Carter's penis—information that would not be within the usual knowledge of a nine-year-old girl. [*Id.* at 131.]

Carter appears to argue that M.C. might have confused anyone for her father, but the record belies this argument. The record shows that prior to Carter's arrest, M.C. was living in the

---

[1] A state court need not cite to or even be aware of Supreme Court precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

family home with Carter, her mother, her younger brother (who was also Carter's child), and her older half-brother. At that time, Carter and M.C.'s mother had been married for five years and together for ten years, M.C.'s entire life. [Trial Tr. at 137.] M.C.'s own testimony also demonstrated that she and Carter had a close father-daughter relationship. She expressed concern about Carter's well-being several times during her testimony, and at one point spontaneously stated that she loved her dad, adding, "He loves me too. He's my friend." [Trial Tr. at 120.] She insisted on making a statement on Carter's behalf at sentencing, telling the judge, "my daddy is friendly" and "he doesn't mean to be bad." [*Id.* at 242.] Also at sentencing, Jessica Carter described the emotional impact Carter's detention was having on M.C., telling the court that M.C. was "adamant that she wants her daddy out of jail." [*Id.* at 238.]

Although M.C. had difficulty making an in-court identification of Carter, the record supports plausible reasons unrelated to Carter's innocence why this might have occurred. The jury could have reasonably concluded that the pressures of testifying in a criminal trial, coupled with M.C.'s cognitive impairments, made it difficult for her to recognize Carter in the unfamiliar setting of the courtroom, particularly after he had been out of the home for several months. *See McFowler*, 349 F.3d at 456 ("[W]itnesses (including eyewitnesses) often make surprising, contradictory, and nonsensical statements under the stress of courtroom examination, and although such gaffes would permit a factfinder to discredit their testimony, they normally do not command reversal of a conviction on appeal."). The jury also could have concluded that M.C. was reluctant to identify Carter out of concern for his well-being, as she expressed concern on more than one occasion that he would "die" in jail as a result of what he did. [*See* Trial Tr. at 121, 132.]

9

To the extent M.C. had shortcomings as a witness, the jury was made aware of them. M.C. acknowledged during cross-examination that she sometimes gets "confused" about things, and her mother characterized her as having a "vivid imagination." [Trial Tr. at 133–36, 145–52.] Despite the evidence negatively impacting M.C.'s credibility, the jurors, who had the opportunity to see and hear her testimony first-hand, chose to believe her. The jury's credibility determination "commands great deference." *McFowler*, 349 F.3d at 456. Based on the record, Carter has not demonstrated that M.C. was unreliable as a matter of law and that "no court could reasonably think otherwise." *Id.* The Indiana Supreme Court's resolution of this claim was not unreasonable, and accordingly, the claim is denied.

**B.     Admission of Expert Testimony**

Carter next claims that the trial court erred in admitting certain testimony from Dr. Robin Murphy, a psychologist specializing in autism. [ECF No. 1 at 21–22.] Carter argues that he was unfairly prejudiced by Dr. Murphy's testimony that autistic children have difficulty deceiving others due to their cognitive limitations. [*Id.*] Carter raised a claim pertaining to the admission of Dr. Murphy's testimony on direct appeal, but the Indiana Supreme Court concluded that he had waived the claim by failing to object at trial. *Carter*, 754 N.E.2d at 881. The court nevertheless considered whether Carter could satisfy the "fundamental error" standard such that the claim should be reviewed even though it was not properly preserved. *Id.* at 881–82. The court concluded that Carter did not satisfy this standard. *Id.* at 882.

When a state court denies a claim based on an adequate and independent state procedural ground, the claim is defaulted and cannot be reviewed on the merits. *Coleman*, 501 U.S. at 729.

Waiver constitutes an adequate and independent state procedural ground that bars federal review. *Sturgeon v. Chandler*, 552 F.3d 604, 611 (7th Cir. 2009). The fact that the Indiana court considered whether Carter could establish fundamental error to overcome the waiver does not change this outcome. *Lee v. Davis*, 328 F.3d 896, 900 (7th Cir. 2003) (Indiana court's consideration of whether there was fundamental error in connection with a waived claim did not undermine reliance on the independent state procedural ground of waiver). Accordingly, Carter's claim is procedurally defaulted and cannot be reviewed on the merits unless he establishes some basis for setting aside the default.

Carter argues that he can establish cause and prejudice to excuse the default based on his counsel's failure to object to this testimony at trial. [*See* DE 41-1 at 25–29.] To establish cause and prejudice based on counsel's deficient performance, Carter must satisfy the standards that apply to a free-standing claim of ineffective assistance.[2] *See Franklin v. Gilmore*, 188 F.3d 877, 883 (7th Cir.1999) ("Attorney error that constitutes ineffective assistance of counsel is cause to set aside a procedural default.").

Under the Sixth Amendment, a criminal defendant is entitled to "effective assistance of counsel—that is, representation that does not fall below an objective standard of reasonableness in light of additional prevailing professional norms." *Bobby v. Van Hook*, 130 S. Ct. 13, 16 (2009). To prevail on a claim of ineffective assistance, the petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). On the deficiency prong, the central question is "whether an

---

[2] Carter was also required to independently exhaust an ineffective assistance claim on the grounds asserted before it can be used to excuse a procedural default. *See Dellinger v. Bowen*, 301 F.3d 758, 766–67 (7th Cir. 2002). The record shows that Carter exhausted such a claim in the post-conviction proceedings. *See Carter*, No. 49A03-0803-PC-253, slip op. at 9-10.

attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices." *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011). The Court's review of counsel's performance is deferential, and there is an added layer of deference when the claim is raised in a habeas proceeding; the petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004). The Court presumes that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690, and will "evaluate [counsel's] performance as a whole rather than focus on a single failing or oversight," *Ebert v. Gaetz*, 610 F.3d 404, 412 (7th Cir. 2010). The Court also must take care not to evaluate counsel's performance with the benefit of hindsight: "In determining how searching and exacting their review must be, habeas courts must respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore*, 131 S.Ct. 733, 741 (2011).

On the prejudice prong, the petitioner must show there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome," and it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Instead, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. Where it is expedient to do so, the Court may resolve an ineffective assistance claim solely on the prejudice prong, because if the petitioner cannot establish prejudice, there is no need to "grade" counsel's performance. *Id.* at 697.

In rejecting Carter's ineffective assistance claims, the Indiana Court of Appeals properly identified *Strickland* as the governing standard. *See Carter*, No. 49A02-0803-PC-253, slip op. at 6. The court determined that Carter's trial counsel, William Rawls, was not deficient in failing to object to Dr. Murphy's testimony because an objection would not have been sustained under Indiana law. *Id.* at 9–10. Based on the record, this was not an unreasonable application of *Strickland*.

When an ineffective assistance claim is premised on the failure to object to certain evidence, the claim hinges on state law; if the evidence was admissible under state law, counsel cannot be considered ineffective for failing to object. *Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001). The testimony at issue here occurred during Dr. Murphy's direct examination, when she was asked to provide background information about the nature of autism. In doing so, she described how autistic children tend to think very concretely and lack what she termed a "theory of mind." [Trial Tr. at 157.] She stated, "[T]o put it very simply, they're not aware that you have a mind that thinks differently than they do." [*Id.* at 157–58.] To explain her point, she described a study that explored the ability of autistic children to "sabotage versus deceive."[3] [*Id.* at 155.] Dr. Murphy's assessment of the results of the study was that it showed autistic children are capable of sabotaging others through manipulation of the physical world, but that they have difficulty with mental deception. On cross-examination, Carter's counsel questioned Dr. Murphy about the study and her conclusions. In response to this line of questioning, Dr. Murphy testified,

---

[3] In the study Dr. Murphy described, autistic children were given a box and told there was candy in it. They were then told that if a friend came they should unlock the box so he or she could get the candy, but that if a thief came they should lock the box. The children had no difficulty performing this task. However, when they were told to tell the thief that there was no candy in the box, they had difficulty doing so. As Dr. Murphy explained, due to the concrete nature of their thought-processes, autistic children "have a very, very difficult time manipulating what's in someone's mind." [Trial Tr. at 159.]

"I never talk in absolutes. I would never say that absolutely every child with autism absolutely has no imagination and is incapable of making up something that didn't happen." [Trial Tr. at 166–67.] She further testified that autistic children tend to think and act concretely, but added, "That's not to say that they absolutely will never lie." [*Id.* at 165.]

Upon consideration of this testimony, the state court determined that Dr. Murphy did not impermissibly vouch for M.C.'s credibility under Indiana law. *See Carter*, 754 N.E.2d at 882–83. This Court is bound by that determination in deciding whether Carter's counsel was ineffective in failing to object to this testimony. *See Earls v. McCaughtry*, 379 F.3d 489, 495 (7th Cir. 2004) (federal habeas court was bound by state court's determination that evidence at issue was admissible under state law in assessing ineffective assistance claim premised on failure to object). Because Carter has not established that an objection to Dr. Murphy's testimony would have been sustained, he has failed to establish ineffective assistance of counsel on this ground. Likewise, he has not established cause to set aside his procedural default.

Carter also asserts that his claim should be reviewed on the merits because he is actually innocent. [ECF No. 41-1 at 14.] This is a difficult standard to meet, and such claims are "rarely successful." *Schlup*, 513 U.S. at 324. A prisoner asserting innocence as a gateway to a defaulted claim must show that "in light of new evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *House,* 547 U.S. at 537. The petitioner must support the innocence claim "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. The reviewing court must consider all the evidence, old and new, and make a "probabilistic determination about what reasonable, properly instructed jurors

would do." *House*, 547 U.S. at 538. "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.*

In support of his actual innocence claim, Carter points to a video made by his sister four years after the trial in which M.C. purportedly stated that she now believed her father "might be innocent." [Post-conviction ("PCR") Tr. at 237; Pet.'s PCR Ex. H at 1.] Carter presented this video in the post-conviction proceedings, but the court was unable to view it because the tape was defective, and the court rejected a transcript of the tape prepared by Carter's sister as not properly authenticated. [PCR Tr. at 228, 237–38.] According to the unauthenticated transcript Carter submitted, which was included in the post-conviction record, M.C. stated that she thought someone named Max, whom she identified as her mother's boyfriend, had "stold daddy's identity." She stated that she thought her father "might be innocent," and that Max may have been the one who molested her. She expressed regret that she "got dad in prison." [Pet.'s PCR Ex. H at 1.]

Assuming Carter could overcome the evidentiary problems with this video, it would not establish his actual innocence. "Courts treat recantations and claims of perjury with great skepticism even under the best of circumstances." *U.S. ex rel. Jones v. DeRobertis*, 766 F.2d 270, 272 (7th Cir. 1985). In this case, M.C.'s statements were made under far less than ideal circumstances given her cognitive impairments, the passage of time, and the opportunity for coaching by Carter's relatives. The tape also indicates that M.C. had her own motivations for wanting to exculpate Carter. It is not known exactly what difficulties M.C. experienced in her life following Carter's conviction, but by the time she made this video, M.C. had been

adjudicated a ward of the state and was living in a group home. [*See* Pet.'s PCR Ex. G at 3.] The transcript of the video suggests that M.C. hoped her statement would lead to Carter's release, and in turn, her departure from the group home. She stated to her father on the tape, "I really want to see you again someday, I really hope I can get out of here soon." [*Id.*] Carter's sister replied, "Well, if your daddy gets a new trial you might be out of here." [*Id.*] This apparent manipulation of a troubled child seriously discredits the persuasiveness of the tape. Furthermore, M.C.'s statements on the tape purporting to exculpate Carter were confusing and equivocal, and at most expressed her belief that Carter "might" be innocent. [Pet.'s PCR Ex. H at 1.] M.C.'s younger brother Marcus also made statements on the tape, and further undercut the persuasiveness of M.C.'s statements when he stated, "I know [M.C.] doesn't really know what she means when she says that dad, that you, max stold his identity." [*Id.* at 2.] Indeed, Carter himself does not appear to believe that Max molested M.C. [*See* DE 41-1 at 21; PCR Tr. at 229.] The video falls far short of proving that someone else committed the offense.

To the extent the video reflects on M.C.'s credibility as a witness, the jury was already fully aware of issues impacting her credibility, including her inability to identify Carter in court. The jury nevertheless chose to credit M.C.'s testimony. This Court cannot make a probabilistic determination that a reasonable jury would reach a different result if it heard an equivocal and confused statement by M.C. to Carter's sister years after the crime. *See Whitlock v. Godinez*, 51 F.3d 59, 64 (7th Cir. 1995) (petitioner did not establish actual innocence based on new evidence that "add[ed] to the baggage" of the state's two principal witnesses, since the jury had been "well aware of serious attacks upon the credibility" of these witness at trial).

Carter also points to affidavits he submitted in the post-conviction proceedings from friends and family members attesting that, prior to this incident, Jessica told them she wanted to leave Carter and start a new life. [*See* Pet's PCR Ex. F-J.] He appears to believe Jessica's statements show she had a motive to fabricate the entire story. The court rejected these affidavits on hearsay grounds. [PCR Tr. at 235-41.] Even if the Court could consider this evidence, it would not establish Carter's actual innocence for several reasons. First, Jessica's out-of-court statements to Carter's family and friends would not be admissible at trial. Ind. R. Evid. 801. Furthermore, testimony from friends and family of the accused is significantly less probative than testimony from witnesses with no motive to lie. *House*, 547 U.S. at 552.

Additionally, while this type of circumstantial evidence might be "somewhat probative," it is not "direct evidence" of Carter's innocence like eyewitness testimony or reliable physical evidence. *See Whitlock*, 51 F.3d at 64; *Holmes v. Hardy*, 608 F.3d 963, 968 (7th Cir. 2010) ("troubling" new evidence impugning the credibility of state's witness did not establish actual innocence, since at best it established a "mere possibility" that a jury presented with the evidence would have exonerated the petitioner, "not a probability, as is required."). Furthermore, Jessica provided testimony at trial that was favorable to the defense, readily acknowledging that M.C. had a vivid imagination and had falsely remembered events in the past. Because Jessica's testimony was actually helpful to the defense, the Court cannot make a probabilistic determination that a reasonable jury hearing evidence attacking her credibility would find Carter not guilty.

It is also notable that during a videotaped interview with Detective Graban on the day Jessica reported this incident to police, she told Detective Graban that she had been wanting to

17

leave Carter for some time, in part because Carter had been physically violent toward her. [Trial Tr., State's Ex. 1.] She reported that the two had not been sexually intimate for almost three years and had been sleeping in different rooms. [*Id.*] This part of the tape was not played for the jury. However, based on the tape, it appears highly unlikely that opening up the issue of Jessica's apparent unhappiness in the marriage would result in a more favorable outcome for Carter. For these reasons, the Court finds Carter's claim of actual innocence unavailing.

Assuming *arguendo* that Carter could overcome the procedural default of his claim pertaining to Dr. Murphy's testimony, the claim would fail on the merits. In essence Carter is challenging a state evidentiary ruling, and "the Due Process Clause does not permit federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Anderson v. Sternes*, 243 F.3d 1049, 1055 (7th Cir. 2001). Rather, habeas relief will be warranted only if an erroneous evidentiary ruling was "so prejudicial" that it "produced a significant likelihood that an innocent person has been convicted." *Id.* at 1054. Carter cannot meet this high standard here.

On direct appeal, the Indiana Supreme Court considered whether Carter could satisfy the "fundamental error" standard in connection with the admission of Dr. Murphy's testimony, a standard comparable to determining whether a due process error occurred.[4] *Carter*, 754 N.E.2d at 881–82. The court concluded that Carter did not satisfy this standard, and this determination was not unreasonable based on the record. *See id.* at 881–82. As explained above, although Dr. Murphy testified that as a general matter autistic children have difficulty deceiving others, she did not vouch for M.C.'s credibility, nor did she testify that M.C.'s account was believable. Dr.

_____

[4] The Indiana Supreme Court has described the "fundamental error" standard as follows: "This Court views the fundamental error exception to the waiver rule as an extremely narrow one, available only when the record reveals clearly blatant violations of basic and elementary principles of due process, and the harm or potential for harm cannot be denied." *Ford v. State*, 704 N.E.2d 457, 461 (Ind. 1998).

Murphy's testimony about purposeful deception also did not directly undermine the defense theory, which was that M.C. had imagined the incident, not that she was intentionally lying. To support the defense theory, Carter's counsel elicited helpful testimony from Dr. Murphy about the confused nature of an autistic child's thought processes and memories. Dr. Murphy acknowledged that autistic children often make unusual associations, and that they might take occurrences with no relationship to each other and "put them together into an event." [Trial Tr. at 171–72.] She further testified, "They're concrete, they're literal. And although I've worked with them for years and I usually know, there are many times where they'll make associations . . . that I have no idea how they came up with the information they did." [*Id.* at 170.]

Thus, notwithstanding Dr. Murphy's testimony, the jury was left to make its own determination about whether M.C. was accurately remembering what occurred. Carter has not established that her testimony created a significant likelihood that the jury convicted an innocent person. The state court's resolution of this claim was not unreasonable and, accordingly, Carter is not entitled to habeas relief on this claim.

## C.      Ineffective Assistance of Counsel

In claim three, Carter raises several grounds of ineffective assistance of trial counsel, each of which the Court will address separately. [ECF No. 1 at 22–24.]

### 1.      *Failure to Object to Expert Testimony*

Carter first claims that counsel was ineffective in failing to object to Dr. Murphy's testimony. [ECF No. 1 at 22.] For the reasons stated above, Carter has not shown that the state

court's resolution of this claim was an unreasonable application of *Strickland,* and so this claim must be denied.

2.      *Failure to Investigate*

Carter next claims that counsel failed to conduct an adequate investigation. [ECF No. 1 at 22.] Under the Sixth Amendment, counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S at 690–91. The decision whether to investigate must be assessed for reasonableness based on the circumstances, "applying a heavy measure of deference to counsel's judgments." *Id.* at 691. To establish prejudice in connection with counsel's failure to investigate, the petitioner must make a "comprehensive showing" of what further investigation would have revealed. *United States v. Zillges*, 978 F.2d 369, 373 (7th Cir. 1992).

Here, the Indiana Court of Appeals rejected Carter's failure to investigate claim, concluding that counsel spent a significant amount of time conducting a pretrial investigation. *Carter*, No. 49A02-0803-PC-253, slip op. at 7–8. Based on the record, this determination was not unreasonable. The record shows that, prior to trial, counsel's investigation included the following: he interviewed M.C.; he took taped statements from M.C. and her mother; he spent numerous hours researching autism at the Indiana University Medical School, including whether autism has an effect on a child's ability to tell the truth, and; he spoke with individuals involved in the educational side of autism to ascertain how an autistic child would respond to her environment. *Id.* At the post-conviction hearing, Rawls testified that he spent a "multitude of hours" on pretrial investigation of the case. [PCR Tr. at 154.]

Carter does not dispute that counsel took the above actions; he simply believes that counsel should have done more to investigate other potential suspects, particularly M.C.'s older half-brother James. [ECF No. 41-1 at 22–24, 72–73.] At Carter's post-conviction hearing, Rawls testified that he was aware there was an older brother living in the home at the time of the incident. [PCR Tr. at 108–11; *see also* PCR Ex. I at 28, 40.] However, his impression after speaking with Carter and his wife was that M.C. had imagined the entire incident, not that someone else had molested her. [PCR Tr. at 108–11.] He adopted this as his defense theory and conducted his pretrial investigation accordingly. Based on the pretrial investigation and research he conducted, counsel was able to effectively cross-examine the state's expert witness, eliciting testimony from her that even though an autistic child may think his or her perception of an event is correct, in reality the child is mistaken. [Trial Tr. at 163–77.] He was also able to effectively cross-examine M.C. and her mother, eliciting testimony that M.C. gets "confused" about things and had imagined events that did not actually occur. [Trial Tr. at 133–36, 145–52.]

Counsel further testified at the post-conviction hearing that he thought it would have been inconsistent with the defense theory to present evidence to the jury that a different person committed the offense. As he put it, "[W]hen you chase two rabbits, it's hard to catch either one." [PCR Tr. at 197.] Counsel's strategic decision to focus on one defense theory rather than potentially confusing the jury with alternate theories was not unreasonable. Furthermore, the defense theory he chose to pursue had a reasonable chance of success, given M.C.'s impairments and the lack of any physical evidence to show that she was molested. In hindsight, Carter wishes counsel would have adopted a different defense theory, arguing to the jury that James committed the offense. However, he has not made a showing of what an investigation of James would have

revealed. Instead he posits generally that "[a]ny adult male who wore briefs and had access to [M.C.] could have been her attacker."[5] [ECF No. 41-1 at 21.] This is insufficient to establish prejudice in this proceeding. *See Zillges*, 978 F.2d at 373. Given the substantial deference that is afforded to counsel's strategic decisions, the state court's rejection of Carter's failure to investigate claim was not unreasonable and, accordingly, the claim is denied.

### 3. *Failure to Object to M.C.'s Videotaped Statement*

Carter claims that counsel was deficient in failing to object to the admission of M.C.'s videotaped statement to Detective Graban. [ECF No. 1 at 22.] As the respondent points out, Carter did not raise any such claim on appeal to the Indiana Court of Appeals in the post-conviction proceedings. [*See* ECF No. 11-9.] Although he raised ineffective assistance claims on other grounds, each ground of ineffective assistance is considered separate for exhaustion purposes. *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007). Thus, "the failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to a procedural default." *Id.*; *see also Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) (to exhaust an ineffective assistance claim the petitioner must have "identified the specific acts or omissions of counsel that form the basis for her claim of ineffective assistance."). Accordingly, this claim is procedurally defaulted.

---

[5] In the post-conviction proceedings, Carter submitted affidavits from his sisters stating, among other things, that James lived with the family and "had access to M.C" at the time of the offense. [Pet.'s PCR Ex. F at ¶ 12; Pet.'s PCR Ex. K at ¶ 11.] Even if the Court could consider this evidence, it would not change the analysis of Carter's claim, as it is already apparent from the record that James lived in the home at the time of the incident.

Carter argues that he properly presented this claim by including it in an oversized brief that was rejected by the Indiana Court of Appeals. [ECF No. 41-1 at 8–9, 34–35, 46. ] On post-conviction review, Carter initially sought to file an appellate brief that was approximately 218 pages long. [*See id.* at 32–35.] The court rejected the brief due to its length but granted Carter leave to file a shorter brief by a date certain. *Carter*, No. 49A02-0803-PC-253 (Ind. Ct. App. order dated Oct. 17, 2008.) Carter later submitted a brief of nearly 100 pages that was accepted for filing and considered on the merits. [*See* ECF No. 11-9.]

Carter asserts that any claim contained in the rejected brief was properly presented to the state court of appeals. [ECF No. 41-1 at 34–36, 59.] This argument is unavailing. "Procedural default occurs when a petitioner fails to follow the state procedural requirements on presenting federal claims and therefore deprives the state court of the opportunity to address those claims." *Martin v. Evans,* 384 F.3d 848, 854 (7th Cir. 2004); *see also Franklin v. Gilmore*, 188 F.3d 877, 881 (7th Cir. 1999) (holding that procedural default occurs when the petitioner fails to present a claim "at the time and in the way required by state law"). That is precisely what occurred here. Carter's original brief was rejected because it did not comport with state procedural requirements regarding length of briefs, and because of this failing the state court did not consider the brief on the merits. See Ind. App. R. 44(D). Accordingly, he did not properly present the claims contained in his rejected brief to the state appellate court.

Carter alternatively argues that the state court's refusal to let him file his oversized brief constitutes "cause" to set aside his procedural default. [ECF No. 41-1 at 34–36, 62, 83.] This argument is also unavailing. Cause for a procedural default is established by showing that some type of "external impediment" prevented the petitioner from presenting his claim in the state

courts. *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). Here, the appellate court did not in

any way limit Carter to what arguments he could make on appeal; it merely required him to

comply with length requirements applicable to all appellate briefs. Carter's subjective decision to

omit certain claims from the 100-page brief he ultimately filed cannot be considered an "external

impediment" that prevented him from presenting his claim. *See Murray*, 477 U.S. at 492.

Accordingly, Carter has failed to establish cause to set aside his procedural default.

Even if Carter could overcome the procedural default, his ineffective assistance claim

would fail on the merits. The record shows that Carter's counsel did raise an objection to the

admission of the videotape at a pretrial hearing, as well as raising an objection to M.C.'s

competency as a witness. *See Carter*, 754 N.E.2d at 881 n. 8. The trial court denied counsel's

objections, finding M.C. to be a competent witness and the videotape admissible under Indiana

law. [Trial Tr. at 122–27.] Because counsel did not reassert an objection contemporaneously

with admission of the evidence at trial (perhaps to avoid drawing further attention to M.C.'s

testimony in front of the jury), he failed to preserve the issue for appeal. *Carter*, 754 N.E.2d at

881 n.8. However, counsel cannot be faulted for deficient performance if the evidence in

question was admissible under Indiana law. *Hough*, 272 F.3d at 898. Under Indiana's Protected

Persons Act, an out-of-court statement pertaining to acts of sexual molestation is admissible

where the victim is under 14 years of age.[6] Ind. Code § 35-37-4-6. There is no dispute that M.C.

met this requirement. The statute also requires that the statement bear indicia of reliability as to

---

[6] The Indiana Supreme Court has explained that the Act's purpose was to "spare children the trauma of testifying in open court against an alleged sexual predator." *Tyler v. State*, 903 N.E.2d 463, 466 (Ind. 2009). The Act addresses hearsay concerns by requiring the trial court to assess the reliability of the statement before it is admitted, and also requires that the protected person be made available for cross-examination during trial. *Id.*

the time, content, and circumstances under which the tape was made. Ind. Code § 35-37-4-6(e). The trial court determined at a pretrial hearing that the tape satisfied this criteria. [Trial Tr. at 120–24.]

On direct appeal, the Indiana Supreme Court considered whether the admission of this evidence constituted fundamental error, and concluded that it did not meet that standard. *Carter*, 754 N.E.2d at 883. Had counsel preserved an objection, the trial court's ruling would have been reviewed for an abuse of discretion. *Cox v. State*, 937 N.E.2d 874, 876 (Ind. Ct. App. 2010). However, there is nothing to indicate that the claim would have fared any better under that standard. The record shows that the tape was made by Detective Graban on the same day M.C. told her mother about the incident; the statement M.C. gave to Detective Graban was consistent with the unsolicited story she told her mother; M.C. stated on the tape without any prompting that her father had molested her; the interview took place outside the presence of her mother and other family members; and M.C. used age appropriate language to explain what occurred. Under similar facts, the decision to admit a child's out-of-court statement was upheld on appeal. *See, e.g., Taylor v. State*, 841 N.E.2d 631, 634–35 (Ind. Ct. App. 2006) (child's out-of-court statement was sufficiently reliable where interview occurred outside mother's presence and interviewer asked no leading questions); *M.T. v. State*, 787 N.E.2d 509, 512–13 (Ind. Ct. App. 2003) (statement of child victim was sufficiently reliable where child's initial statement to mother was unsolicited, mother was not present during the interview with police, child was not asked suggestive questions, and child used age appropriate language to explain what occurred).

Carter appears to argue that counsel was deficient in failing to have the videotape excluded because M.C. was "inadvertently" coached by Jessica Carter. [*See* ECF No. 41-1 at 15,

26-28, 46, 87–88.] It is not clear exactly what Carter means by this statement, but there is no evidence of coaching in the record. Furthermore, the opportunity for coaching would not have been a basis to exclude the videotape altogether, since Jessica was available for cross-examination at trial. *See Pierce v. State,* 677 N.E.2d 39, 44–45 (Ind. 1997) (statement was admissible even though mother was alone with child between the event and her statement, since mother was available for cross-examination regarding coaching at trial); *Taylor*, 841 N.E.2d at 634–35 (child's out-of-court statement was admissible even though mother had a motive to coach child into making false statement, since mother was available to be cross-examined at trial). To the extent Carter is claiming that counsel was deficient in failing to accuse Jessica of coaching during cross-examination, this claim also fails. As already explained, counsel made a strategic decision to adopt a different defense theory, that M.C. had imagined the incident. Jessica provided testimony critical to this defense theory, readily acknowledging that M.C. had a vivid imagination and had falsely remembered events in the past. Indeed, it likely would have appeared odd to the jury for counsel to attack Jessica's credibility under these circumstances.

Carter again points to the affidavits rejected in the post-conviction proceedings, which in his view indicate that Jessica had a motive to coach M.C. into making a false statement. [*See* Pet.'s PCR Ex. J; *see also* Pet.'s PCR Ex. G, K.] Even if this Court could consider the evidence, it would not change the analysis of Carter's claim. The affidavits were made years after the trial, and there is nothing to indicate that Carter gave any of this information to his trial attorney. This Court must assess counsel's performance based on the information known to him at the time, not with the benefit of hindsight. *See Premo*, 131 S.Ct. at 741. At most, the evidence would show that counsel might have had a basis for adopting a different defense theory, but as discussed

above, counsel made a reasonable strategic decision to pursue a defense that M.C. had imagined the entire incident.

The record also shows that counsel took other steps to protect Carter's interests in connection with the videotape. He requested an instruction that the jury must determine the credibility of the witnesses and the weight to be given the evidence, including the statements on the videotape. [Trial Tr. at 123, 140]. The jury was so instructed several times during the trial. [*Id.* at 40, 42, 48, 50, 140.] Counsel also effectively cross-examined M.C. about her statements, a delicate task given the need to avoid appearing overly harsh toward this sympathetic witness, and was able to elicit testimony from her showing that her statement may not have been believable. [Trial Tr. at 133–36.] He also elicited helpful testimony from Jessica Carter that M.C. had a vivid imagination, sometimes got confused about things, and had falsely remembered events in the past. [Trial Tr. at 145–52.]

Therefore, even if this claim were not defaulted, Carter has failed to show that counsel's performance was deficient or that in the absence of an error by counsel the result of the proceeding would have been different. For these reasons, Carter is not entitled to habeas relief on this claim.

4.    ***Failure to Object to Hearsay Testimony***

Carter next claims that counsel was deficient in failing to object to hearsay testimony from Jessica Carter and Officer Graban regarding M.C.'s out-of-court statements. [ECF No. 1 at 22.] Carter did not raise this claim before the Indiana Court of Appeals on post-conviction

review, and so the claim is procedurally defaulted. [*See* ECF No. 11-9 at 15-17.] Carter once again argues that he did raise this claim because it was contained in his rejected brief. [ECF No. 41-1 at 34-36, 59.] For the reasons explained above, this argument is unavailing.

Even if Carter could overcome the procedural default, his claim would fail on the merits. As discussed above with respect to the videotape claim, Carter's counsel did raise an objection to admission of M.C.'s out-of-court statements, but the objection was overruled. [*See* Trial Tr. at 121-23.] M.C.'s out-of-court statements were admissible under Indiana's Protected Person Act, and counsel took multiple steps to protect Carter's interests in connection with the admission of this evidence. Carter has failed to establish that counsel was deficient in this regard or that in the absence of an error by counsel the result of the proceeding would have been different. For these reasons, Carter is not entitled to relief on this claim.

**5.**     *Failure to Present Evidence in Support of Alternative Theory of Defense*

Carter next argues that counsel was deficient in failing to "reveal" to the jury that M.C.'s half-brother James lived in the home at the time of the incident. [ECF No.1 at 22-23.] On post-conviction review, the appellate court construed this as a claim that counsel should have introduced evidence at trial that M.C.'s half-brother James could have committed the offense.[7] *Carter*, No. 49A02-0803-PC-253, slip op. at 12. The court concluded that Carter failed to establish ineffective assistance on this ground, since Rawls made a reasonable strategic decision to employ a different defense theory, and he believed it would have been confusing to present

---

[7] To the extent Carter is alleging some form of prosecutorial misconduct in connection with this claim, it is addressed in connection with his free-standing prosecutorial misconduct claim below.

evidence to the jury in support of an alternate theory. *Id.* The court further concluded that Carter failed to establish prejudice, since he did not offer evidence to show that James committed the offense. *Id.* This determination was not unreasonable based on the record.

As stated above with respect to Carter's failure to investigate claim, Rawls was fully aware that M.C. had an older brother living in the home at the time of the incident. [PCR Tr. at 108-11; *see also* PCR Ex. I at 28, 40.] Counsel opted not to present evidence about James committing the offense because, based on the evidence, he felt a better defense theory was that M.C. had imagined the entire incident. [PCR Tr. at 108–11, 197.] Once again, there is no evidence in the record to support Carter's claim that James committed the offense, other than the fact that he lived in the home at the time. Based on the record, and given the deferential review that applies to counsel's strategic decisions, the Court cannot conclude that counsel acted unreasonably in deciding not to pursue this line of evidence. The state court's rejection of this claim was not unreasonable and, accordingly, the claim is denied.

6.      *Cross-Examination of Jessica Carter*

Carter next claims that counsel was ineffective in failing to object to limitations placed on his cross-examination of Jessica Carter. [ECF No. 1 at 23.] Carter did not raise an ineffective assistance claim on this ground on post-conviction review.  [*See* ECF No. 11-9 at 15–17.] He once again argues that he properly raised this claim because it was contained in his oversized

brief that was rejected by the state appellate court. [ECF No. 41-1 at 34-36, 59.] For the reasons already explained, this argument is unavailing.

Even if Carter could overcome the procedural default, his claim lacks merit. The record shows that during Jessica's cross-examination, Carter's counsel questioned her about M.C.'s "vivid imagination." At one point he asked her, "Is [M.C.] capable of fabricating a story like this one?" [Trial Tr. at 152.] As the prosecutor was objecting, Jessica answered, "Yes." [*Id.*] The trial court sustained the objection and told the jury to disregard the testimony. [*Id.*] Carter appears to argue that counsel should have tried to pursue this line of questioning further. [ECF No. 41-1 at 81–82.] It is not apparent how further questioning on this point would have changed the outcome of the proceeding.

As previously stated, the defense theory was that M.C. had imagined the incident, not that she was purposely lying about what occurred. Carter's counsel was permitted to question Jessica extensively about M.C.'s "vivid imagination," and Jessica acknowledged on cross-examination that M.C. had been known to "take bits and pieces of different events and put them together," and that she had imagined natural disasters that did not actually occur. [Trial Tr. at 112–18; 145–53.] Counsel also put other evidence before the jury to show that autistic children make unusual associations, perceive events different from others, and may remember an event inaccurately. In short, counsel made the jury well aware of the possibility that M.C. was falsely remembering what had occurred. Carter has failed to show that counsel was deficient in failing to pursue this line of questioning, or that in the absence of an error by counsel the result of the proceeding would have been different. For these reasons, he is not entitled to relief on this claim.

### 7.    *Counsel's Instructions in the Habitual Offender Phase*

Carter next asserts that counsel rendered ineffective assistance in connection with his plea to the habitual offender charge. [ECF No. 1 at 23.] This claim is somewhat confusing, but Carter appears to claim that counsel did not properly instruct him on "the sequence of predicate felonies," and that counsel put undue pressure on him to plead guilty. [*Id.*] Carter did not raise any such claim on post-conviction review. [*See* ECF No. 11-9 at 15–17.] He once again argues that he properly exhausted this claim by raising it in his rejected appellate brief. [ECF No. 41-1 at 34–36, 59.] For the reasons already explained, this argument is unavailing.

Even if Carter could overcome the default, his claim lacks merit. It is apparent from the record that Carter had a lengthy criminal record, including at least two prior unrelated felony offenses that qualified him for a habitual offender enhancement under Ind. Code § 35-50-2-8.[8] [*See* Trial Tr. at 64–68.] At the time he entered the plea, Carter stated on the record and under oath that he fully understood the nature of his plea and the rights he was giving up, that he was pleading guilty voluntarily, and that no one had forced him or otherwise induced him to plead guilty. [Trial Tr. at 219-22.] Accordingly, Carter has not established that counsel's performance was deficient or that the result of the proceeding would have been different in the absence of an error by counsel. For these reasons, Carter is not entitled to relief on this claim.

### D.    Admission of Hearsay Testimony

---

[8] According to the presentence report, Carter had a criminal history dating back to when he was 11 years old. [Trial Tr. at 67.] He had prior convictions for burglary, disorderly conduct, auto theft, possession of stolen property, and child molestation, six of which were felony offenses. [*Id.*]

Carter raises a free-standing claim based on the admission of hearsay testimony from Detective Graban and Jessica Carter. [ECF No. 1 at 24.] On direct review, the Indiana Supreme Court determined that Carter waived this claim by failing to preserve an objection at trial. *See Carter*, 754 N.E.2d at 881 n.8. Carter again argues that his counsel's failure to preserve the objection constitutes cause and prejudice to excuse the procedural default. However, as stated above in connection with Carter's ineffective assistance claim on this ground, Carter did not properly exhaust a claim that counsel was ineffective in failing to object to the hearsay evidence. Carter has not provided any basis for excusing this second level of default, and he is therefore "fully defaulted" on this claim. *Dellinger v. Bowen*, 301 F.3d 758, 767 (7th Cir. 2002). To the extent Carter is claiming that he meets the actual innocence exception to excuse this second level of default, that argument is unavailing for the reasons already stated.

Even if Carter could overcome the procedural default, his claim lacks merit. Once again, it is not the province of this Court to engage in a "finely tuned review of the wisdom of state evidentiary rules." *Anderson*, 243 F.3d at 1053. Rather, habeas relief will be warranted only if an evidentiary ruling was "so prejudicial" that it "produced a significant likelihood that an innocent person has been convicted." *Id.* Carter has not met that standard. As explained above in connection with Carter's ineffective assistance claim on this ground, the testimony he challenges was admissible under Indiana's Protected Persons Act and was merely cumulative of M.C.'s own testimony. Although the hearsay testimony showed that M.C. had repeated the same story to others, it did not prove that she was accurately remembering what had occurred. Notwithstanding this testimony, the jury was left to decide the central question in the case—whether the incident had actually occurred as M.C. described. *See Anderson*, 243 F.3d at

1055 (petitioner failed to make necessary showing of prejudice in connection with due process claim where evidence at issue did not constitute a significant aspect of the state's case). The Court cannot conclude that this hearsay testimony likely resulted in the conviction of an innocent person. For these reasons, the claim is denied.

**E.      Use of Alias on Charging Document**

Carter claims that use of the alias "Arvine E. Durham" on the charging information violated his due process rights. [ECF No. 1 at 25.] The Indiana Supreme Court found this claim to be waived because Carter did not object at trial. *Carter*, 754 N.E.2d at 883. Carter argues that he can overcome the procedural default by showing that his counsel was ineffective in failing to object to the alias. However, he did not independently exhaust an ineffective assistance claim on this ground in the state proceedings. Accordingly, Carter is "fully defaulted" on this claim as well. *Dellinger*, 301 F.3d at 767. To the extent he is arguing that his actual innocence excuses this second level of default, that argument is unsuccessful for the reasons already stated.

Even if Carter could overcome the procedural default, the claim would fail. Criminal defendants are entitled to a fair trial but not a "perfect" one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To rise to the level of a due process violation, trial errors must have so infected the trial as to create uncertainty in the outcome of the proceeding. *Alvarez v. Boyd*, 225 F.3d 820, 825 (7th Cir. 2000). On habeas review, trial errors are deemed harmless unless the petitioner can show that an error had a "substantial and injurious effect or influence in determining the verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

On direct review, the Indiana Supreme Court considered whether Carter could satisfy the fundamental error standard in connection with this defaulted claim, comparable to determining whether a due process error occurred. *See Carter*, 754 N.E.2d at 883. The court determined that Carter could not meet this standard, and this determination was not unreasonable based on the record. First, Carter has not established that use of the alias was an error at all. At sentencing, Carter's attorney explained that the alias became a part of Carter's criminal record when he was arrested on a prior charge and had identification with his half-brother's name on it in his wallet. *See Carter*, 754 N.E.2d at 883 n.9. Carter does not dispute the accuracy of the alias. Additionally, Carter's alias was a very minor issue in the overall context of the trial. The jury did not hear testimony or argument pertaining to the alias. Although the charging document containing the alias was sent back with the jury, the document was not critical to the state's case or to the jury's deliberations.[9] Indeed, there were various documents sent back with the jury, and there is no basis in the record to conclude that the jury would have focused on or even noticed that the charging document contained an alias. *See United States v. Dodds*, 569 F.3d 336, 339–40 (7th Cir. 2009) (finding that a prosecutor's questions about the defendant's use of alias did not unduly prejudice him in the eyes of the jury, since the reference was not protracted); *Alvarez*, 225 F.3d at 825 (stating that on habeas review "courts must be careful not to magnify the significance of errors which had little importance in the trial setting."). Therefore, even if this claim were not defaulted, Carter has failed to establish a due process violation. For these reasons, Carter is not entitled to habeas relief on this claim.

---

[9] The jury was instructed that the charging information was not evidence of guilt but was "merely the formal statutory manner of presenting the charge which must be proved by the evidence introduced at trial." [Trial Tr. at 36.]

**F.        M.C.'s Competency as a Witness**

Carter next raises a free-standing claim based on the trial court's determination that M.C. was a competent witness. [ECF No. 1 at 26.] On direct appeal, the Indiana Supreme Court determined that this claim had been waived. *Carter*, 754 N.E.2d at 883. The court's finding of waiver constitutes a procedural default. *Lee*, 328 F.3d at 900. Carter again argues that his attorney's deficient performance constitutes cause and prejudice to set aside the procedural default. Carter properly exhausted an independent claim based on his attorney's failure to object to M.C.'s competency as a witness, but as addressed above, he failed to establish that his counsel's performance was deficient on this ground. In turn, he has not established cause to excuse his procedural default.

Even if Carter could overcome the procedural default, he could not prevail on his underlying claim. Once again, to obtain habeas relief, Carter must show that the state court's ruling was so prejudicial that it created a significant likelihood that an innocent person was convicted. *Anderson*, 243 F.3d at 1053. The Indiana Supreme Court determined that Carter could not meet the fundamental error standard in connection with this claim, comparable to determining whether a due process violation occurred. *See Carter*, 754 N.E.2d at 883. Based on the record, this determination was not unreasonable.

At a pretrial hearing held to consider M.C.'s competency, the following exchange occurred:

> Prosecutor: Look at the Judge. He's asking if you will tell the truth. Do you know what that is?
> M.C.: It's something special that you should tell the truth always. You have to tell the truth—all—everybody tell the truth.
> Prosecutor: Are you going to tell the truth today?
> M.C.: Yes.

The Court: [M.C.], do you swear under—swear to God—
M.C.: It's the truth about it's my dad.
Prosecutor: Okay. But wait. Before you tell about your dad, tell the Judge that you swear to tell the truth.
M.C.: I swear to tell the truth, Judge. . . . .
Prosecutor:  [M.C.] can you see my suit? Can you look at my suit?
M.C.: Yes, I see your suit.
Prosecutor: If I said—
M.C.: It's beautiful.
Prosecutor: Thank you. If I said it was white would be the truth or a lie?
M.C.: A lie.
Prosecutor: Why is it a lie?
M.C.: Because your shirt is—your suit is black.
Prosecutor: Is it important to tell the truth?
M.C.: Yes.
Prosecutor: Why?
M.C.: Because you don't want people to end up in jail. Who lied has to—who lies would get the wrong person into jail.

[Trial Tr. at 118–19.]

In the above exchange, M.C. demonstrated that she knew the difference between the truth and a lie, and she accurately and in her own words explained why it was important to tell the truth. She also promised to provide truthful testimony. The record also shows that M.C. was an intelligent child, and that, if anything, her cognitive impairments made it more difficult for her to purposefully deceive others. The trial judge, who had the opportunity to observe M.C. first-hand, determined that she was a competent witness. This was in essence a credibility determination, as it hinged on M.C.'s body language, facial expressions, and overall demeanor during the competency hearing. This Court cannot readily upset the trial judge's determination based on a review of the cold appellate record. *See Murrell v. Frank,* 332 F.3d 1102, 1120 (7th Cir. 2003). In light of the deferential nature of this Court's review of state evidentiary rulings, Carter has not established a due process violation in connection with M.C.'s competency. For all these reasons, the claim is denied.

**G.      Admission of M.C.'s Videotaped Statement**

Carter next raises a claim based on the trial court's admission of M.C.'s videotaped statement. [ECF No. 1 at 27.] On direct appeal, the Indiana Supreme Court determined that this claim was waived. *Carter*, 754 N.E.2d at 883. The court's finding of waiver constitutes a procedural default. Carter again argues that ineffective assistance of counsel excuses his default, but as discussed above with respect to Carter's ineffective assistance claim on this ground, he did not properly exhaust this claim in one complete round of state review. Therefore, Carter is "fully defaulted" with respect to this claim. *Dellinger*, 301 F.3d at 767. To the extent he is claiming actual innocence to excuse this second level of default, that argument is also unavailing.

Even if Carter could overcome the procedural default, his claim lacks merit. For the reasons fully explained above in connection with Carter's challenge to the hearsay testimony, this evidence was admissible under state law, and Carter has not demonstrated that the admission of the evidence violated his due process rights. For these reasons, he is not entitled to relief on this claim.

**H.      Cross-Examination of Jessica Carter**

Carter claims that the trial court improperly restricted his counsel's cross-examination of Jessica Carter in violation of his due process rights. [ECF No. 1 at 28.] On direct appeal, the Indiana Supreme Court determined that this claim had been waived and that Carter could not satisfy the fundamental error standard. *Carter*, 754 N.E.2d at 883. Carter again argues that

ineffective assistance of counsel excuses his default, but as discussed above with respect to Carter's ineffective assistance claim on this ground, he did not properly exhaust this claim in one complete round of state review. Therefore, Carter is "fully defaulted" with respect to this claim. To the extent he is asserting actual innocence to excuse this second level of default, that argument fails for the reasons already stated.

Even if Carter could overcome the procedural default, his claim would fail on the merits. Once again he is challenging a state evidentiary ruling, and to obtain relief he must show that the ruling was so prejudicial that it produced a significant likelihood that an innocent person was convicted. *Anderson*, 243 F.3d at 1053. On direct review, the Indiana Supreme Court determined that Carter could not show a fundamental due process error in connection with this defaulted claim. *Carter*, 754 N.E.2d at 883. This determination was not unreasonable based on the record.

As explained above in connection with Carter's ineffective assistance claim on this ground, Carter's counsel opted to pursue a defense theory that M.C. had imagined the incident, not that she was purposely lying. In support of the defense theory, counsel was permitted to question Jessica extensively about M.C.'s vivid imagination and her past false memories about incidents that did not actually occur. Carter has not demonstrated how limitations on Jessica's cross-examination resulted in the conviction of an innocent person. For these reasons, he is not entitled to habeas relief on this claim.

## I. Prosecutorial Misconduct

Carter next claims that the prosecutor committed misconduct when she "conceal[ed]" that M.C.'s half-brother, James, lived in the home and could have been the perpetrator. [ECF No. 1 at

28-29.] He also claims that the prosecutor denied him a fair trial based on two comments she made during closing arguments. [*Id.*] On post-conviction review, the Indiana Court of Appeals found Carter's prosecutorial misconduct claims to be waived because they were not raised on direct appeal. *Carter*, No. 49A02-0803-PC-253, slip op. at 6. Accordingly, the claims are procedurally defaulted. Carter argues that ineffective assistance of his appellate counsel excuses the procedural default, but he did not properly exhaust an ineffective assistance claim on this ground in one complete round of state review. *See Carter*, No. 49A02-0803-PC-253, slip op. at 6. Therefore, Carter is "fully defaulted" with respect to this claim. As already explained, he has not provided adequate grounds for excusing this second level of default.

Even if Carter could overcome the procedural default, his claims lack merit. With respect to the first ground of alleged prosecutorial misconduct, concealment of evidence, Carter is correct that a prosecutor has an obligation to disclose exculpatory or impeaching evidence to the accused. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). However, the prosecutor could not have "concealed" evidence pertaining to James's existence, since Carter obviously knew that James was living in his home at the time of this incident. *See United States v. Banks*, 405 F.3d 559, 563 (7th Cir. 2005) (government did not "suppress" evidence pertaining to confidential informant when the defendant was aware of the informant's existence before trial). Carter's counsel was also aware that James was living in the home but, as described above, he chose not to pursue this line of evidence because he made a strategic decision to adopt a different defense theory. Counsel's strategic decision cannot be turned into a claim of misconduct by the prosecutor.

Carter also claims that the prosecutor denied him a fair trial by comments she made during closing arguments. [ECF No. 1 at 29.] The state appellate court considered these

arguments in the context of Carter's claim that his trial counsel was ineffective in failing to object to the comments, and the court determined that the comments did not deprive Carter of a fair trial. *Carter*, No. 49A02-0803-PC-253, slip op. at 10-11. This determination was not unreasonable based on the record.

In *Darden v. Wainright*, 477 U.S. 168 (1986), the Supreme Court adopted a two-prong test for determining whether a prosecutor's comments in closing argument constitute a denial of due process. The Court must first look to the challenged comments to determine whether they were improper. *Darden*, 477 U.S. at 181–83; *Ellison v. Acevedo*, 593 F.3d 625, 636 (7th Cir. 2010). If the comments were improper, the Court must consider a number of factors to determine whether the defendant was prejudiced by the comments, including: (1) whether the prosecutor misstated the evidence; (2) whether the remarks implicated specific rights of the accused; (3) whether the defense invited the response; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut. *Ellison*, 593 F.3d at 636. "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181. Rather, "[t]he relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*

Here, Carter challenges two comments the prosecutor made pertaining to M.C.'s inability to identify Carter in court. The comments pertained to the following testimony occurring during M.C.'s direct examination:

> Q. Is your dad in the courtroom?
> A. Well, he must be.
> Q. I want you to look over on that side of the room. Do you see your dad?
> A. No.

Q. Look right over there. See the man with the striped shirt? Who is that man?
A. He doesn't seem to be my dad. It's not.
[Prosecutor]: Could you take your glasses off, please? (Request made of the Defendant)
Q. Does it look like your dad if he has his glasses off?
A. Well, he—are you my dad? Over there, are you?
Q. Can you see him from here?
A. I see him.
Q. Okay. Don't worry about that.
A. Man—man with the striped shirt, are you my dad?
(R. at 130–31.)
Q. ... Do you remember why your dad went to jail?
A. 'Cause he touched my w[ie]nie.
Q. Tell me about that.
A. It wasn't a dream though, but he had truth that—I just don't want him to go to jail though.
Q. I want you to tell me about him touching your w[ie]nie.
A. Well—
Q. Where did that happen?
A. At night—in my bedroom at night.
Q. And how did it happen?
A. And . . . he just told me to touch it—touch it with my hand first, then I touched it in my mouth.
Q. What did it feel like?
A. Rubber, to both.
Q. To both?
A. Yeah.
Q. What did your dad say to you—when he asked you to touch it what did he say?
A. Well, he told me not to tell. He said, don't—go touch my w[ie]nie, but tell mommy.
Q. All right. Did you tell your mommy?
A. Yes.
Q. What did you tell your mommy?
A. The same thing—things that happened. All the truth. I told her all the truth.

*Carter*, 754 N.E.2d at 879 n.2 & n.3.

In commenting on this testimony, the prosecutor stated during her rebuttal argument:

[M.C.] sat up there today on the witness stand, in front of you, and she told you what she knows. That she couldn't identify her father should be no surprise. He looks different. And he refused to acknowledge her request for identification. If he was her father wouldn't he have said something to her. I mean, that's no due

fault of his own. But, from her perspective, here's a man that's being represented as my dad and he doesn't look right to me and I say, are you my dad and she gets no response. Of course she doesn't think it's her dad. Her dad would have said, yes, I'm your dad.

[Trial Tr. at 214–15.]

Carter first asserts that the prosecutor presented "false evidence" to the jury when she commented that he "looks different," when in fact he had not changed his appearance between his arrest and the time of trial. [ECF No. 1 at 29.] As this Court reads it, the prosecutor was simply suggesting—albeit somewhat inartfully—that Carter may have looked different to M.C. in the unfamiliar setting of the courtroom. She did not suggest that Carter had purposefully changed his appearance or otherwise done something improper. Nor did she dwell on the issue, as this was the sole reference to Carter's appearance in her lengthy closing arguments. Additionally, the jury was instructed that the arguments of counsel should not be considered as evidence. [Trial Tr. at 45.] Given the ambiguity of this brief remark, the Court cannot conclude that the prosecutor's comment "so infected the trial" as to deny Carter due process.

Carter also claims that the prosecutor's comment about his failure to respond to M.C. implicated his Fifth Amendment right to remain silent. [ECF No. 1 at 29.] This Court does not read the prosecutor's comment to be a reference to Carter's failure to take the stand. Rather, she was attempting to explain M.C.'s perception of events occurring in the courtroom, suggesting that it may have seemed odd to M.C. that Carter did not respond when she asked him if he was her father, making her more reluctant to identify him.

Even assuming the comment was improper, it was not unduly prejudicial. The prosecutor's comment was brief and came at the end of a lengthy argument focusing on M.C.'s credibility as a witness. The prosecutor clarified during her closing argument and at the time of

M.C.'s testimony that Carter was not under any duty to respond to M.C.'s question. [*See* Trial Tr. at 131, 214.] Additionally, the jury was instructed on two occasions that Carter had no duty to testify. In its initial instructions, the court told the jury that Carter was presumed innocent, that the burden throughout rested on the state, and that Carter was not "required to present any evidence to prove his innocence, nor to prove, do, or explain anything." [*Id.* at 40.] In its final instructions, the court advised the jury that Carter had exercised his constitutional right not to testify and instructed that he was under no duty or obligation to testify, that the burden rested entirely on the state, and that the jury should not consider his failure to testify in any way in reaching the verdict. [*Id.* at 45.] Based on the record, Carter has not shown that the prosecutor's brief comments denied him a fair trial. For all these reasons, he is not entitled to relief on this claim.

## J.      Denial of Due Process in the Post-Conviction Proceedings

In his final claim, Carter asserts that the state court violated his due process rights in connection with evidentiary rulings it made in the post-conviction proceedings. [ECF No. 1 at 31.] However, federal habeas relief is not available for alleged errors occurring in the state post-conviction proceedings, since such errors do not implicate the legality of the petitioner's confinement. *See Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987); *Jackson v. Duckworth*, 112 F.3d 878 (7th Cir. 1997). Accordingly, this claim does not present a cognizable basis for granting federal habeas relief.

**K.      Motion to Supplement the Record**

Carter has filed a motion seeking to supplement the record with multiple documents that the post-conviction court declined to consider. [*See* ECF No. 38.] He seeks to present this evidence in connection with his claim that the post-conviction court violated his due process rights, but as stated above, that claim is not cognizable in this proceeding. Carter also requests that this Court obtain a copy of his rejected oversized brief from the Indiana Court of Appeals, and documents related to that filing, but such action is unnecessary. [ECF No. 38.] The Court has presumed for purposes of this opinion that the brief contained the arguments Carter claims it does. However, for the reasons already explained, Carter did not properly present the claims contained in his rejected brief to the Indiana Court of Appeals.

Despite the lack of a clear argument on this point, the Court has considered whether Carter is attempting to tender the evidence to show that he was precluded from developing his claims in state court, such that he should be permitted to develop them in an evidentiary hearing in this proceeding. *See* 28 U.S.C. § 2254(e)(2). A habeas petitioner is entitled to a hearing to develop his claims only when his factual allegations "if true, would entitle [him] to federal habeas relief." *Schiro v. Landrigan*, 550 U.S. 465, 474 (2007). For the reasons explained herein, even if Carter's factual allegations as reflected in his additional documents were true, he would not be entitled to habeas relief on any of his underlying claims. *See id.* ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). For these reasons, Carter's motion to supplement the record will be denied.

**L.     Certificate of Appealability**

As a final matter, the Court must consider whether to grant Carter a certificate of appealability. 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court finds that Carter has met this standard with respect to his sufficiency of the evidence claim. Given the lack of any physical evidence against him and the cognitive impairments of the state's primary witness, jurists of reason could debate whether there was sufficient evidence to find Carter guilty beyond a reasonable doubt. Accordingly, the Court grants Carter a certificate of appealability on the following issue: Whether the state court's denial of his sufficiency of the evidence claim constituted an unreasonable application of *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). The Court concludes that Carter has not met the necessary standard with respect to any other claim in his Petition.


**CONCLUSION**

For the reasons set forth above, the Court:

(1) **DENIES** the Petitioner's Motion to supplement the record [ECF No. 38];

(2) **DENIES** the Petition [ECF No. 1];

(3) **GRANTS** the Petitioner a certificate of appealability on his sufficiency of the evidence claim as stated herein; and

(4) **DENIES** all other relief.

SO ORDERED on March 8, 2011.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION